# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES DENT,

        Plaintiff,

v.

        Case No. 3:16-CV-442-NJR-GCS

NICK NALLEY, DENISE MINOR,
WINNIE BRADDOCK,
JASON GARNETT, TY WALLACE,
and BARRY LASATER,

        Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Charles Dent, an inmate in the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging Defendants, in concert with each other, engaged in a course of retaliatory conduct against him for exercising his First Amendment right to file grievances and lawsuits against them. Before the Court are two motions for summary judgment: one filed by Defendants Nick Nalley, Denise Minor, Winnie Braddock, and Barry Lasater (Doc. 182) and one filed by Defendant Ty Wallace (Doc. 186). For the reasons explained below, the Court denies Defendant Wallace's motion, and the motion filed by Defendants Nalley, Minor, Braddock, Lasater, and Garnett is granted in part and denied in part.

## BACKGROUND

At all times relevant to this action, Dent was incarcerated at Big Muddy River Correctional Center ("Big Muddy"). On February 28, 2018, Dent, through appointed counsel, filed an amended complaint raising the following claims:

**Count 1:**       First Amendment retaliation against Defendant Nick Nalley and Jason Garnett for exposing Dent as a confidential informant.

**Count 2:**       First Amendment retaliation against Defendants Denise Minor, Nick Nalley, and Winnie Braddock for improperly refusing to send Dent's privileged mail.

**Count 3:**       First Amendment retaliation against Defendant Denise Minor for improperly conducting a Prison Rape Elimination Act (PREA) investigation with a retaliatory motive.

**Count 4:**       First Amendment retaliation against Defendant Denise Minor for placing Dent with a violent, homophobic cellmate.

**Count 5:**       First Amendment retaliation against Defendants Denise Minor and Ty Wallace for illegally disclosing confidential information about Dent with the intent to have him first from his job in the law library.

**Count 6:**       First Amendment retaliation against Defendants Denise Minor and Barry Lasater for improperly taking Dent's legal papers.

**Count 7:**       Violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act against Defendant Ty Wallace.

## A. Counts 1, 3, and 4

At some point before Dent transferred to Big Muddy in July 2012, he was incarcerated at Centralia Correctional Center, which is where he met Defendant Nick Nalley. According to Dent, Nalley was a correctional officer at Centralia, and the two men had a good, cordial relationship. (Doc. 182-1, p. 5-6). Nalley worked in Internal Affairs at Big Muddy. He remembered that Dent worked in the law library at Centralia and referred him to Jennifer Wilson, who was a supervisor in the library, for a job. (Doc. 187-7, p. 6). Jennifer Wilson testified that the recommendation from Nalley was out

of the ordinary. (Doc. 192-3, p. 2). She suspected that Dent was assigned to the library to keep an eye on the school building. (Doc. 192-3, p. 3).

Dent began working in the law library on or about February 26, 2016, and, on February 28, 2016, he was moved from his cell in one-house to a cell in three-house. He believes he was moved away from another inmate, Shane Marcentel, and that the move was retaliatory because he tried to provide information about Marcentel to Defendant Nalley. Dent testified there is a big difference between one-house and three-house, in that one-house was quieter with more mature inmates while three-house is louder and run by "gang bangers." (Doc. 187-1, p. 8). Dent complained about his reassignment to the warden, the placement office, internal affairs, and "everybody," and he was told that all of the library workers were being moved to three-house. (Doc. 187-1, p. 9). Nalley testified there was a phase where Big Muddy moved all of the students and the school workers to three-house. (Doc. 187-7, p. 14). According to Dent, however, no other library workers moved with him. (Doc. 187-1, p. 9).

As a library worker, Dent helped other inmates file lawsuits, including lawsuits against internal affairs officers at Big Muddy. He testified that Nalley and the internal affairs team did not want him to help the inmates file lawsuits against them and that it became a source of conflict. Dent felt like he was stuck in the middle and had to choose between doing his job by helping inmates and helping Nalley by keeping other inmates from complaining about him. (Doc. 182-1, p. 9). His experiences in dealing with Nalley and internal affairs caused him great concern with how the unit operated, and Dent wanted to do something about it. (Doc. 182-1, p. 10-11).

Jennifer Wilson submitted an incident report on March 3, 2016, about events that occurred the day before. She reported that Dent asked about the whistleblower statute. Dent allegedly told her, "I know that I.A. is dirty, but I'm afraid if I try to turn them in, they'll be notified (I.A. staff) and then I'm done, Ms. Wilson, then I'm done for sure." Wilson went on to note that the former internal affairs supervisor, Big Muddy "appeared to be run by thugs in I.A. who are unscrupulous." Dent also told her that the internal affairs officers "are breaking the law and breaking the rules, covering for themselves, for other security staff, and for some inmates even. I'm the only one who knows it all, and if I tell they will know that it's me who told on them. They will kill me for sure, Ms. Wilson." At the end of the conversation, she spoke to her supervisor, and he advised that she speak to the warden, Defendant Jason Garnett. (Doc. 182-2).

Dent testified that the retaliation against him began in earnest on March 3, 2016. (Doc. 187-1, p. 5). According to Dent, he had been working as a confidential informant for internal affairs, primarily with Nalley. He alleges that one of his roles for internal affairs was to control the number of lawsuits and grievances that inmates filed. On March 3, 2016, Nalley summoned Dent and asked him if he was okay, which Dent later tied to an incident report Jennifer Wilson turned over to Garnett. Garnett, in turn, allegedly gave the report to Nalley. During his conversation with Nalley, Dent provided information about what he viewed as threats to Marcentel. He felt like Nalley wasn't listening to him and described the meeting as the last boiling point in feeling fed up with Nalley. (Doc. 187-1, p. 5-6).

Defendant Nalley testified that Dent never worked as a confidential informant for him. He claims Dent wanted to meet with him on March 3, 2016, to discuss Dent's

reassignment to three-house. Nalley described the conversation as relaxed. He did not remember their conversation involving information about other inmates, but he did remember that Marcental told him that he and Dent had been in a relationship that ended. (Doc. 187-7, p. 14-15). At some point during the conversation, Dent claims that Defendant Jason Garnett, the warden, called Nalley to see if Dent was with him. Nalley allegedly warned him to watch what he said to Garnett. Garnett came to the internal affairs office and talked with Dent and Nalley about a meeting in the library that Dent missed because he was talking with Nalley. (Doc. 182-1, p. 13).

According to Dent, Nalley—with a retaliatory motive— relayed everything he said to Marcentel, who then told other inmates that Dent was working with internal affairs. (Doc. 187-1, p. 5-6). On March 22, 2016, Dent filed a grievance because other inmates were coming up to him in the library and telling them they heard he was working with internal affairs. (Doc. 187-1, p. 6). He claims that the grievance never got to its intended recipient because Defendant Nalley held it up.

In a March 29, 2016 grievance, Dent again complained about retaliation by Nalley. He attached a copy of his March 22 grievance and indicated that he signed a declaration against Nally on March 25, 2016, and that he was in the process of exposing corruption in the internal affairs department. He complained that Nalley was known for retaliating against inmates who filed grievances. (Doc. 182-4).

Dent testified that on April 7, 2016, Marcentel got together with Nalley and Defendant Denise Minor and told them that Dent was running the lines in the library, kicking off an investigation into whether he was abusing his position. Dent was not punished after this alleged investigation. (Doc. 187-1). He claims the next retaliatory

incident came on April 14, 2016, when he was sent to segregation for approximately eight days due to an investigation under the Prison Rape Elimination Act (PREA). (Doc. 187-1, p. 7-8). According to an April 14, 2016 incident report, an inmate reported to a correctional officer that he had been sexually harassed by Dent in the school building. Dent allegedly told this inmate that he was going to get him moved and that he was going to have sex with him. Dent was then moved to segregation on investigative status. (Doc. 182-9).

Defendant Denise Minor was a supervisor in internal affairs at Big Muddy in 2016. Her supervisor was the warden. (Doc. 187-6, p. 3). She described Nalley as a good, thorough officer. (Doc. 187-6, p. 5). She testified that internal affairs received a lot of false PREA reports but that they have to investigate every report under the guidelines. According to Minor, inmates sometimes submit false reports to get a different housing assignment or cellmate. (Doc. 187-6, p. 6). Inmates against whom a claim has been filed must be kept separate until the investigation is complete. The inmates are sent to segregation on investigative status, but it is not meant to be punitive. (Doc. 187-6, p. 6).

Minor testified that she first met Dent during the PREA investigation in April 2016. (Doc. 187-6, p. 8). She found it difficult to interview him because he would not stay focused on her questions and wanted to talk about a grievance instead. (Doc. 187-6, p. 9). Other than the grievances he brought up during their conversation, Minor testified that she was unaware of any grievances Dent filed before their interview. (Doc. 187-6, p. 9-10). She denies making any threats to Dent if he kept filing grievances. (Doc. 187-6, p. 10). Dent, however, testified that Minor focused their conversation while he was held on investigative status on whether he wanted to pursue his grievance against Nalley, and

Dent claims that Minor said that she and Garnett wanted to know what he planned to do about the grievance. (Doc. 182-1, p. 21).

Dent was released from investigative status on April 22, 2016, but he claims that he was released hours later than usual due to retaliation by Defendant Minor. He testified that Minor also intentionally assigned him to cell with a very aggressive inmate who was homophobic in retaliation for his complaints about Nalley. He claims that his cellmate threatened him and would lock him out of the cell. (Doc. 187-1, p. 7-8). Dent drafted his initial complaint in this action while he was in segregation and filed it the day that he was released. (Doc. 187-1, p. 10).

### B. Counts 5 and 7

Dent went back to work after his release from segregation. On April 26, 2016, Defendant Minor allegedly pulled Dent from the library line and held him for three hours to investigate his grievance against Nalley and internal affairs. (Doc. 187-1, p. 9). According to Minor, their conversation focused on Marcentel, and Dent was upset about him more than anything else. When she tried to steer the interview back to Nalley, Dent would return to talking about Marcentel. (Doc. 187-6, p. 13). She found Dent hard to follow during the interview. She was not aware that he had filed a lawsuit days before their meeting. (Doc. 187-6, p. 14).

Minor decided to refer Dent for a mental health appointment because he was crying and visibly shaken up during their conversation. (Doc. 187-6, p. 15). In the incident report she drafted in relation to the referral, Minor wrote that she made it due to Dent's inability to focus during their interview and because he appeared to be overwhelmingly obsessed with other inmates' legal matters. (Doc. 187-8). Dent maintains that her claims

about his mental status during their meeting are untrue and that Minor made the referral to induce him drop his grievances. (Doc. 187-1, p. 10).

Dent testified that he did not want to go to the appointment, but he met with Defendant Ty Wallace, a mental health provider, on April 27, 2016. (Doc. 187-1, p. 10). Dent said he felt comfortable talking to Wallace because he had seen him before and he thought their conversations were confidential. Dent signed a confidentiality agreement with Wallace. It contained a confidentiality disclosure statement:

> I understand there are limits to confidentiality within a correctional setting. I understand that the treating Mental Health Professional is required to disclose any information regarding: Suicidal, Homicidal, and Self Injurious Ideation; Unreported Child or Elder Abuse/Neglect; Safety and Security Issues; and may disclose information for the purpose of Multidisciplinary Team Consultation or Placement Issues.

(Doc. 187-5).

Following their meeting, Wallace disclosed in an incident report that Dent "presented as having delusions of persecution based on legal work he has done for other offenders, stating he has been retaliated against, siting [sic] a recent cell move in R-3 as one action of retaliation." He also wrote that Dent seemed preoccupied with his conspiracy theory and that Dent told him that he planned to file a lawsuit over it. (Doc. 187-4). According to Dent, he was fired because of the information in the incident report in an act of retaliation by Wallace and Minor. (Doc. 187-1, p. 12). Wallace, however, maintains that he made his recommendation out of concern for Dent.

Dent was removed from his job in the law library following Wallace's recommendation. Jennifer Wilson, a library supervisor, testified that she appreciated having Dent as a library worker because he made the library a better place. (Doc. 192-3,

p. 3). She also testified that she overheard other prison employees, including Nalley, make jokes or lewd and lascivious comments about inmates' sexuality. She heard Nalley, in particular, use offensive slurs like "faggot" and "queer" to describe inmates. (Doc. 192-3, p. 4).

### C. Count 6

Defendant Barry Lasater was a correctional officer working as the academic officer at Big Muddy in May 2016. His job was to provide security at the school building where the library was. He remembers Dent as a library worker. (Doc. 182-10, p. 3). At his deposition, he testified that he did not observe anything that led him to believe Dent needed a mental health evaluation. (Doc. 182-10, p. 7).

Lasater testified about a disciplinary ticket he wrote on May 6, 2016. He explained that inmates visiting the library were not supposed to bring anything to the library with them. According to the incident report, Dent was leaving the library that day with papers that he did not have when he arrived, which also was not allowed. Dent allegedly told Lasater they were his legal papers. (Doc. 182-11).

Lasater did not recall the incident but testified that in that situation he would have confiscated the papers because Dent should not have had them. Lasater would have given them to the shift commander to be turned over to the adjustment committee for discipline. (Doc. 182-10, p. 9). Dent maintains the Lasater told him, "this is what happens when you file grievances against Lieutenant Minor and Nalley," but Lasater did not recall saying that. He also testified that it did not sound like something he would say. (Doc. 182-10, p. 10).

### D. Count 2

According to a declaration submitted by Dent, Dawan Jones, an inmate, signed a declaration about Nalley on April 8, 2016. (Docs. 192-1, p. 1, 3) He claims, and the declaration states, that only five copies were made. He kept one and Jones kept one. The other three were sent to various entities via legal mail. On April 11, 2016, he requested his mail log, but the mail log does not show at least three outgoing legal letters that Dent maintains he sent between January 1, 2016, and April 11, 2016. (Doc. 192-1, p. 1-2, 5). One such letter was addressed to the John Howard Association of Illinois and was dated March 17, 2016. (Doc. 192-1, p. 6-7). Two letters dated March 22 and April 5, 2016, that Dent attempted to send to the Uptown People's Law Center also do not appear on the log. (Doc. 192-1, p. 8-11). He also sent a letter to his sister, Diane Dent, on April 17, 2016, discussing his attempts to reach various attorneys by letter. The postmark shows it was not mailed until April 26, 2016. (Doc. 192-1, p. 12-18).

Winnie Braddock responded to interrogatories about her involvement. She indicated that she has no recollection of sending, or being directed to send, Dent's mail to Nalley, Minor, or Garnett. She also indicated that Dent was not, to her knowledge, on a "mail watch" list by internal affairs. (Doc. 182-7). Minor testified that she never instructed Defendant Winnie Braddock to hold Dent's mail. (Doc. 187-6, p. 8). Jones submitted a declaration in this action indicating that Minor somehow gained possession of one of the copies of his earlier declaration and showed it to him. Dent maintains she could not have had a copy unless she intercepted his legal mail.

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. P. 56(a)); *accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

**B. First Amendment Retaliation**

To succeed on a claim of First Amendment retaliation, a plaintiff must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take

the retaliatory action. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). An inmate has a constitutional right to file a grievance as part of his right of access to the courts under the First Amendment. *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Retaliatory official action violates the Constitution, even if the officer would be otherwise authorized to take that action in the absence of a retaliatory motive. *See Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000).

In a First Amendment retaliation claim, the burden of proof is split between the parties. *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (citing *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274 (1977)). First, a plaintiff must show that the defendant's conduct was sufficient to cause the injury, that is, that the protected First Amendment conduct was a motivating factor for taking the retaliatory action. *Id.* at 634-635. The burden then shifts to the defendant to rebut by showing that the action would have occurred anyway, regardless of the improper motive. *Id.* at 635.

### C. Illinois Mental Health and Developmental Disabilities Confidentiality Act

The Mental Health and Developmental Disabilities Confidentiality Act is carefully drawn to maintain the confidentiality of mental health records. *See Sassali v. Rockford Memorial Hospital*, 693 N.E.2d 1287, 1290 (Ill. 1998). Absent an exception, the Act prohibits the disclosure of confidential communications made to a mental health service provider without consent of the patient. A confidential communication is defined as "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health . . . services to a recipient." 740 ILCS § 110/2. Exceptions to the Act are narrowly drawn, and the

"legislature has been careful to restrict disclosure to that which is necessary to accomplish a particular purpose." *Norskog v. Pfiel*, 755 N.E.2d 1, 9 (Ill. 2001).

DISCUSSION

### A. Count 1: Exposure of Plaintiff Charles Dent as a confidential informant by Defendant Nick Nalley and Defendant Jason Garnett

Only persons who cause or participate in an alleged constitutional deprivation are responsible under Section 1983. *See, e.g., Greeno v. Daley*, 414 F.3d 645, 656-57 (7th Cir. 2005). Defendants Nalley and Garnett argue that there is no evidence of their personal involvement in exposing Dent as a confidential informant. But Dent claims that, after his March 3, 2016 conversation with Defendant Nalley, Shane Marcentel repeated "word-for-word" the content of the conversation, which Marcentel could not have done unless Nalley relayed the information to him. Based on this alleged disclosure by Nalley, word spread through Big Muddy that Dent was an informant. Nalley denies that Dent was an informant and denies that he disclosed any of this information to Marcentel. Given the differing version of events put forth by the parties, there is a dispute of material fact as to Defendant Nalley's involvement in the alleged release of Dent's role as a confidential informant.

Defendant Garnett's involvement in identifying Dent as a confidential informant is more tenuous. Dent alleges that Garnett gave Jennifer Wilson's incident report, in which she wrote about corruption in the internal affairs unit, to internal affairs and, presumably, to Nalley. Dent seemingly argues that Garnett's decision prompted Nalley to disclose that Dent was an informant. There is insufficient evidence to support such a contention, however, and the link between forwarding a report for investigation and

another official's alleged decision to expose Dent is too speculative to survive summary judgment.

**B. Count 2: Confiscation of Legal Mail by Defendants Denise Minor, Winnie Braddock, and Nick Nalley**

Defendants Minor, Braddock, and Nalley argue that they are entitled to summary judgment on Dent's legal mail claim because they were not personally involved in withholding or blocking Dent's legal mail from being sent. Dent did not argue that Nalley was personally involved in his response to Defendants' motion (*See* Doc. 189, p. 10-11), and there is insufficient evidence of his personal involvement. Accordingly, Defendant Nalley is entitled to summary judgment on Count 2.

There is a question of fact as to whether Defendant Minor was involved in Dent's complaints about his mail. According to Dent, he had Dawan Jones, an inmate, prepare an affidavit, and the men made five copies of it. Dent and Jones both maintain that Dent kept a copy, Jones kept a copy, and the remaining three copies were sent in legal mail. According to Jones, Minor showed him a copy of the declaration during an April 29, 2016 meeting in the internal affairs office. (Doc. 190-3). Dent argues that she could not have a copy of the declaration without intercepting it from his legal mail. Minor denies any involvement in intercepting or stopping Dent's mail. A reasonable juror could conclude that Minor was personally involved in the acts alleged by Dent depending upon how these disputes of fact are resolved at trial.

Unlike the evidence supporting Dent's claim against Minor, there is insufficient evidence that could allow a reasonable juror to find that Defendant Braddock interfered with Dent's legal mail. Unlike the disputed testimony that Minor possessed copies of

documents sent in legal mail, there is no evidence that Braddock was in possession of Dent's legal mail in any improper manner. While she may have been a link in the chain between Dent and a mailbox, that does not sufficiently tie her in a culpable way to Minor's alleged possession of Dent's mail.

### C. Count 4: Cell Reassignment after PREA Investigation by Defendant Denise Minor

Defendant Minor maintains that she has no role in cell assignments and that she did not play a role in selecting the cell that Dent was assigned to after his release from investigative status. According to Dent, during the PREA investigation interview with Minor, she began asking him if he intended to pursue his grievance against Defendant Nalley. He claims that he asked to stay in segregation and to be sent to another institution. Minor allegedly refused because she would not be able to watch him if he left. Dent testified that Minor then began scanning the computer to look for a cellmate for him and that she chose the most hated, homophobic inmate in the prison. There is a clear dispute of material fact as to Minor's personal involvement in the Dent's cell reassignment that must be resolved by a jury.

### D. Count 5: Recommendation to Fire Plaintiff Charles Dent by Defendants Denise Minor and Ty Wallace

Defendant Minor argues that she was not personally involved in having Dent fired from his library job. Defendant Wallace made the recommendation to remove Dent from his job, but Dent points to an email sent by Wallace attaching the incident report about their mental health appointment. Minor is included on the email, and Wallace references a conversation, though he was unsure if he spoke with Minor or Major Eric Plott, a recipient on the email, before drafting the email. (Doc. 187-2, p. 24, Doc. 190-2). Wallace

testified that he had never made a recommendation to remove an inmate from a job assignment, but he did not recall speaking with Minor about the decision.

Dent also denies Minor's claims that she made the referral to Wallace because he was emotional or had any difficulties during their meeting. He claims instead that she made vague threats of retaliation if he continued to pursue his grievances during the PREA investigation and during an April 26, 2016 conversation in the internal affairs office. Minor made the referral on April 27, 2016, and Wallace met with Dent at 9:10 a.m. that morning. Dent points to the short timeframe between the referral and the appointment as evidence of Minor's involvement. Given the differing versions of events put forth by the parties, there is a genuine dispute of material fact as to Defendant Minor's personal involvement in the decision to recommend that Dent be removed from his job assignment.

Defendant Wallace argues he is entitled to summary judgment because the removal of Dent from his job assignment did not actually deter Dent from exercising his First Amendment rights. The inquiry in a First Amendment retaliation claim, however, is whether the "retaliatory activities would 'deter a person of ordinary firmness' from exercising First Amendment activity in the future." *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Knowing that filing grievances and lawsuits complaining about internal affairs could lead to retaliation in the form of the loss of desirable privilege (i.e., a good job assignment) could deter a person of ordinary firmness from engaging in protected First Amendment activity in the future, and a reasonable juror could so find. As such, Defendant Wallace is not entitled to summary judgment on Count 5.

### E. Count 3: Retaliatory PREA Investigation by Defendant Denise Minor and Count 6: Improper Confiscation of Legal Papers by Defendant Minor and Defendant Barry Lasater

Minor argues that the April 2016 PREA investigation had to happen regardless of any retaliatory intent on her behalf, seemingly arguing that the defendant's portion of the split burden of proof, whether the harm would have occurred anyway, requires that summary judgment be entered in her favor. Dent does not claim, however, that the investigation was not required. Instead, his claim is that it was prolonged, along with his time in investigative segregation, and evolved into a pretense to pressure him into dropping his grievance against Defendant Nalley out of something akin to duress. As such, there is a question of fact as to whether the investigation would have been conducted in the same manner absent retaliation by Minor.

Likewise, in Count 6, Dent claims that Lasater told him that he was confiscating his papers because of the grievances Dent filed. There is a question of fact as to whether Lasater would have taken that action and the harm would have occurred anyway absent a retaliatory motive that precludes the entry of summary judgment. As this is the only argument raised by Defendants as to Count 6, summary judgment will not be granted as to this claim.

### F. Count 7: Violation of Mental Health and Developmental Disabilities Confidentiality Act by Defendant Ty Wallace

In favor of his motion for summary judgment on Count 7, Defendant Wallace argues that Dent was a "committed person" and that as a committed person, "in the course of providing services, a therapist … may disclose … communications without consent to any department, agency, institution or facility which has custody of a recipient

pursuant to State statute or any court order of commitment. 740 ILL. COMP. STAT. § 110/9. Due to Dent's status as a committed person, Wallace suggests that he was permitted to disclose the content of his communications with Dent to other officials within Big Muddy. This line of reasoning is undercut by the confidentiality waiver signed by Dent before his appointment with Wallace on April 27, 2016, which enumerated specific circumstances under which Dent should not expect confidentiality within IDOC.

Wallace also ignores the next sentence of the statute: "Information may be disclosed under this Section *only to the extent* that knowledge of the record or communications is essential to the purpose for which disclosure is made and only after the recipient is informed that such disclosure may be made." 740 ILL. COMP. STAT. § 110/9 (emphasis added). The incident report prepared by Wallace disclosed confidential communications between Dent and Wallace. The parties dispute the purpose of the disclosure, and there is a genuine question of material fact as to whether the information was disclosed "in the course of providing treatment" or for another reason. There is also a dispute of fact as to whether the disclosure was limited, as required, because Wallace disclosed not only information about Dent's mental health status but also his decision to file a lawsuit. Given these disputes, Wallace is not entitled to summary judgment on Count 7.

### G. Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232; *see also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S.Ct. 348, 350 (2014).

As the Court found in favor of Defendant Jason Garnett (Count 1), Defendant Nick Nalley (Count 2 only), and Defendant Winnie Braddock (Count 2), they are entitled to qualified immunity on those counts because the facts, when taken in the light most favorable to Dent, do not demonstrate that their conduct violated a constitutional right.

The remaining IDOC defendants are not entitled to qualified immunity because a prisoner's right to file grievances and lawsuits without fear of retaliation was clearly established at the time of the events alleged in Dent's amended complaint. *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

## H. Damages

The IDOC Defendants argue that the Court should find that Dent cannot receive compensatory damages because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). This is not a blanket prohibition on compensatory damages in the absence of a physical injury but rather prohibits compensatory damages for mental or emotional injuries in the absence of a physical injury. Even if Dent does not prove a physical injury at trial, he may still recover nominal damages, punitive damages, or any kind of compensatory damages other than those for mental or emotional injury. *Calhoun v. DeTella*, 319 F.3d 936, 940-41 (7th Cir. 2003); *see also Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011).

The IDOC Defendants also ask the Court to find that Dent cannot seek punitive damages at trial. Given the disputes between the parties, there are genuine questions of material fact as to whether punitive damages are appropriate. At this time, a reasonable juror could conclude that the conduct of one or more of the IDOC defendants demonstrates a reckless or callous disregard as to Dent's federally protected rights. *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). As such, the Court declines to limit Dent's ability to pursue punitive damages at this time.

## I. Deprivation Likely to Deter Free Speech

The IDOC Defendants raise a brief argument that Dent did not suffer a deprivation likely to deter free speech. They suggest that the actions allegedly taken against Dent would not deter a person of ordinary firmness from engaging in First Amendment Activity in the future, but this question is best left to a jury, particularly in light of the cursory argument made to the contrary.

### Conclusion

For these reasons, the Court **DENIES** Defendant Ty Wallace's motion for summary judgment (Doc. 186). The motion for summary judgment filed by Defendants Nick Nalley, Denise Minor, Winnie Braddock, Jason Garnett, and Barry Lasater (Doc. 182) is **GRANTED in part** and **DENIED in part**. At the close of the case, the Clerk of Court shall enter judgment:

- On Count 1, in favor of Defendant Jason Garnett and against Plaintiff Charles Dent; and

- On Count 2, in favor of Defendant Nick Nalley and Defendant Winnie Braddock and against Plaintiff Charles Dent.

The following claims remain pending:

- Count 1 against Defendant Nick Nalley;

- Count 2 against Defendant Denise Minor;

- Count 3 against Defendant Denise Minor;

- Count 4 against Defendant Denise Minor;

- Count 5 against Defendant Denise Minor and Defendant Ty Wallace;

- Count 6 against Defendant Denise Minor and Defendant Barry Lasater; and

- Count 7 against Defendant Ty Wallace.

Magistrate Judge Gilbert C. Sison is **DIRECTED** to set this case for a settlement conference.

**IT IS SO ORDERED.**

**DATED:  September 23, 2019**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**